# EXHIBIT A

**EMPLOYMENT AGREEMENT**

This Employment Agreement (the "Agreement"), with an effective date of TBD and contingent upon Vestwell's successful acquisition of the Sumday Administration, LLC business, is executed by and between Vestwell Holdings, Inc., a Delaware corporation ("Vestwell" or the "Company") and Sarah Riefenstahl, an individual (the "Employee"). In consideration of the mutual covenants and other good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, the parties agree as follows:

1. **Employment.** The Company employs the Employee and the Employee accepts such employment upon the terms and conditions set forth in this Agreement.

2. **At-Will Employment.** The term of employment ("Term") of the Employee will begin on TBD (the "Start Date") and shall continue until terminated pursuant to the provisions of Section 6 hereof. The Employee's employment hereunder is at-will and will continue until terminated by the Employee or the Company for any reason, or no reason, with or without Cause (as defined below). This Agreement is not intended to and shall not be construed as creating a contract guaranteeing employment for any specified duration and to the extent anything in this Agreement is inconsistent, this Section 2 will govern. If either Party terminates your employment with the Company, including your voluntary resignation of employment, each Party agrees to provide at least one (1) month prior written notice of the effective date of termination so that we can facilitate a proper transition of services to our clients and other employees.

3. **Duties and Services**. The Employee agrees to serve as a VP, 529 & ABLE at the Company. The Employee shall report to the President, VSS of the Company. The Employee agrees to serve the Company faithfully, diligently, and to the best of his/her ability, devoting his/her entire business time, energy and skill to his/her employment under this Agreement in compliance with the Company's policies, practices, and procedures. Employee agrees to perform from time to time such Employee services, advisory or otherwise, as the Company shall request and to act in such capacities or other offices for the Company as the Company shall reasonably request, without further compensation other than that for which provision is expressly made in this Agreement (the Employees services and duties hereunder, collectively, the "Services"). The Company reserves the right to reassign responsibilities, reporting lines, titles, or make other changes to the scope of Employee's responsibilities during the Term of employment. The Employee further agrees that he/she shall not knowingly cause the Company, any of its direct or indirect, present or future, subsidiaries (collectively, the "Subsidiaries") or any of their employees to violate any laws, rules and regulations applicable to any of them and that the Employee shall not knowingly engage in, cause, or permit the Company or any of the Subsidiaries or employees to engage in any activity that is illegal or unethical.

4. **Compensation.**

   a. For as long as Employee remains employed by the Company, Employee agrees to accept a salary (the "Salary") for all his/her services at the rate of $182,000 per annum (the "Base Salary"). The Base Salary may be modified from time to time at the Company's discretion as it deems necessary and it is payable in accordance with the Company's standard payroll policy. The Employee shall be eligible to participate in any profit sharing, incentive-based compensation, or equity or equity-based compensation arrangements provided to similarly situated employees of the Company from time to time, based upon goals specified by the Company, as approved by the Company, and subject to the provisions of the applicable plans and applicable law.

   b. Employee understands and agrees that neither Vestwell nor any of its subsidiaries, successors, officers, directors, shareholders, or employees shall be obligated or responsible in any way to pay any compensation, insurance, equity, or benefits of any kind that Employee may have been entitled to while an employee of or in connection with any employment by Sumday Administration, LLC, its parent company, any affiliate, or any other prior employer (collectively, "Sumday"). This includes, but is not limited to, payment or compensation for any deferred compensation, bonus pay, commissions, vacation pay, insurance, stock, or any other value or consideration that Employee may have accrued or otherwise be entitled to by Sumday.

5. **Employee Benefits.** The Employee shall be entitled to participate in any benefit plans provided to other similarly situated employees of the Company, subject to and in accordance with the terms of those plans and applicable law. These benefits include, as of the Start Date, health, hospitalization and medical insurance programs. The Company is not required to establish or maintain any such plans and may modify or terminate those plans at any time.

6. **Termination.** Notwithstanding anything to the contrary contained in this Employment Agreement, the Employee's employment under this Agreement, as well as the Employee's eligibility for and right to any Base Salary, bonus and other benefits or compensation which otherwise would accrue, shall terminate upon the earliest to occur of the following events:

   a. The death of the Employee;

   b. The disability (as defined in this Agreement) of the Employee;

   c. Upon delivery of written notice of such termination, with or without Cause, to the Employee from or on behalf of the Company;

   d. The agreed upon effective date of a notice of termination from the Employee; or

   e. At the option of the Company, upon the merger or consolidation of the Company, or the direct or indirect sale of all or substantially all of the assets, business or equity interests of the Company, in each case in an arms-length transaction with or to an entity not related to or affiliated with the Company as of the time of the applicable transaction (a "Change of Control").

Upon termination of employment for any reason, Employee shall be paid his/her Standard Entitlements in accordance with the Standard Entitlements Payment Schedule. For purposes of this Agreement, "Standard Entitlements" means (i) Base Salary accrued but unpaid as of the termination date, (ii) employee benefits that continue following the termination date under the terms of the applicable plans and applicable law and (iii) approved expense reimbursements for reasonable business expenses incurred in the performance of the Services and unpaid as of the termination date; and the "Standard Entitlement Payments Schedule" means (i) in the case of Base Salary, the pay date immediately following the termination date, or if earlier, the date required under applicable law, (ii) in the case of employee benefits, the schedule required under the terms of the applicable plans and applicable law, and (iii) in the case of business expense reimbursements, schedule set forth in Section 20 hereof.

7. **Disability**. For purposes of this Agreement, the term "Disabled" or "Disability" shall be defined as the event that the Employee shall fail to render and perform the essential functions required of his under this Agreement for 90 consecutive days or any 120 aggregate days in any 12-month period because of physical or mental incapacity or disability. If the Employee is deemed to be Disabled for purposes of this Employment Agreement, s/he may be terminated by the Company on account thereof, at the option of the Company. Any such decision by the Company to terminate the Employee's employment hereunder on account of Disability shall be effectuated by the Company by written notice to the Employee.

8. **Termination for Cause.** For the purpose of this Agreement, the term "Cause" of the phrase "Termination for Cause" is defined as the commission by the Employee of a felony or an offense involving moral turpitude or the Employee engaging in fraud, theft, embezzlement, self-dealing, obtaining funds or property under false pretenses, or a similar act of misconduct; the Employee engaging in a breach of a fiduciary duty he owes to the Company, its Subsidiaries, clients, or any of their affiliates; the material breach by the Employee of any of the provisions of this Agreement, the failure to perform the Services with the standard of care required thereof in the Company's business, as reasonably acceptable by the Company, or the failure, in performing the Services, to achieve any sales or other targets or goals communicated to the Employee as the minimum targets or goals expected of the Employee during the Term or any portion thereof. If the Company, in its sole and absolute discretion, considers a Cause event to be curable, Employee shall be given a period within which to effectuate such cure, such period not to exceed 30 calendar days, and the failure to effectuate such cure within the cure period will result in a termination of employment with no additional notice or opportunity to cure required to be given. The Company, in its sole and absolute discretion, but in good faith, shall determine whether the applicable Cause event has been cured within the cure period.

9. **No information from prior employer**. By signing below, Employee represents that s/he is not subject to or in violation of and will not engage in any activities during employment with the Company that could constitute any non-solicitation, non-competition, or any other kind of restrictive agreement with any prior employer or agreements relating to a prior employer's use or ownership of intellectual property. Additionally, Employee represents that s/he has not taken any confidential or other proprietary records, data, source code, or trade secrets from a prior employer, will not use any such

records or information in connection employment at Vestwell, and will not store any such records on any Vestwell system or equipment.

10. **Severance; Release**.

a. In the event of and only upon the termination by the Company of the employment of the Employee under this Agreement, other than for “Cause,” death, or Disability and subject to the provisions of this Agreement, the Company in its sole discretion may offer Employee a severance upon termination of employment equivalent to the Salary earned but unpaid as of the date of termination and two weeks’ worth of Base Salary, as in effect as of the date of termination, for each complete 12 months of service with Vestwell ("Severance Payment"). In calculating the Severance Payment, service credit will be given to employment with Sumday Administration, LLC or any of its predecessors, parents or affiliates or any other prior employer. In exchange for the receipt of any portion of the Severance Payment, the Employee must execute a separation and release agreement that gives the Company, its affiliates, and its Subsidiaries, and the shareholders, members, partners, directors, employees, agents, representatives, successors and assigns of any of the foregoing a full release of claims in a form acceptable to the Company (the “Release Agreement”). Employee understands and acknowledges that any Severance Payment pursuant to this Agreement is always made at the Company's sole discretion.

b. The Severance Payment shall be paid to the Employee in consecutive, equal monthly installments or in a lump sum at the Company’s sole discretion, with payments commencing on the first regular payroll date following execution of the Release Agreement and after the expiration of any and all applicable revocation and cancellation periods, provided that such payroll date occurs within the 60-calendar-day period commencing immediately following the date of termination; and provided further, however, that if the 60-calendar-day period begins in one calendar year and ends in another calendar year, the initial payment shall be made in the later calendar year.

c. The Severance Payment made shall be in lieu of any other post-termination date compensation from the Company, other than any post-termination compensation required under applicable law or the provisions of any employee benefit plan in which the Employee participated immediately prior to the date of termination.

d. Without limiting any other rights or remedies which the Company may have, it is understood that the Company shall be under no further obligation to make any installment payments of the Severance Payment and Employee shall reimburse the Company in full (including taxes withheld) if the Employee engages in any activity that would violate any of the restrictions of this Agreement, including those contained in Sections 12, 13, or 15 (“Competitive Activities”).

**11. Retention of Equity Interests.**

a. In the event of a termination for Cause, Employee shall not be entitled to retain any equity interests in the Company granted to him/her during the Term. To the extent any of the provisions of this Section 11 and its subsections of this Agreement conflict with the terms of any Company incentive option plan, the terms of the incentive option plan will govern.

b. In the event of a termination of the Employee by the Company without Cause (excluding death and Disability) or of a voluntary resignation by the Employee from the Company, the Employee retains 100% of the equity interests vested as of the date on which the Employee is notified or notifies the Company of a termination or resignation. The vesting of equity interests is governed by the Employee's Equity Option Grant and as defined in the Company incentive option plan. The Company has the option, in its sole discretion, to repurchase any of the Employee's retained equity interest.

c. In the event of the Employee's death or Disability (as defined in Section 7), his/her estate shall receive 100% of the equity interests vested at the date of death or Disability with remainder (the unvested portion) returning to Company; provided, however, that any voting rights in connection with the equity interests would revert to the Company.

d. In the event Employee is terminated other than for Cause in connection with Change of Control, as determined by the Company in its sole and absolute discretion, the vesting and exercisability of the Employee's equity

interest shall accelerate such that this equity interest shall become 100% vested and exercisable prior to the consummation of the transaction at such time and on such conditions as the Company shall determine.

12. **Non-Competition; Restrictive Covenants; Non-Solicitation**. As a Company employee, Employee is expected to abide by the Company's rules and standards that are set forth in the Employee Handbook, Compliance Manual, our security policies, and by your Manager. The Employee agrees that the Employee shall not, without the prior written approval of Company management, directly or indirectly, whether through any other person, firm, company, partnership or corporation, whether for himself or as agent on behalf of any such person, firm, company, partnership or corporation, and whether as Employee, consultant, principal, lender, partner, member, officer or otherwise:

a. during the Term and for an additional period of 12 months following the termination of employment for any reason, Employee shall not:

i. engage or participate in, become employed by, or render any services in connection with any Competing Business (as defined below) of the Company;

ii. solicit, raid, entice or induce any person or entity which presently is (or during the 12 months preceding the Employee's termination of employment with the Company has been) a client, customer, supplier to become a client, customer, or supplier for any person or entity (other than the Company and its Affiliates) with respect to any product, work, material or service of the type provided, marketed or under development by or on behalf of the Company and/or any of its affiliated organizations

iii. attempt in any manner to persuade any such person, entity, or business to cease to do business or to reduce the amount of business which such person or entity has customarily done or contemplates doing, or to terminate or change adversely any relationship with the Company and/or any of its Affiliates;

iv. employ, retain, or attempt, assist, or induce to employ or retain, directly or by a third party, any person who is or was during the 12 month period preceding the date of termination of the Employee's employment, an employee, consultant, or advisor to the Company and/or its Affiliates;

v. induce or assist any such person to leave the employ of the Company or any of its Affiliates or to cease to be such a consultant, or any programmer or developer for any present or future product, work, material or service of, or marketed by or for, the Company or any of its Affiliates; or

vi. interfere with or otherwise jeopardize any relationship of the Company and/or any of its Affiliates with any Plan Sponsor, advisor, prospective client, licensee, licensor, consultant, or developer.

b. "Competing Business" shall mean Guideline Technologies Inc, Ubiquity (Decimal, Inc. dba Ubiquity Retirement + Savings), Ascensus, LLC, Betterment, LLC and Human Interest, Inc and any of their affiliated organizations, parent companies, or subsidiaries that currently exist at the time this Agreement is executed or that exist in the future.

c. Nothing in this Agreement shall prohibit the ownership by the Employee of less than 1% of the outstanding securities of any class of any company whose common stock is publicly traded on a national stock exchange, including, without limitation, on NASDAQ.

d. The Employee acknowledges that the enforcement of any of the restrictions contained in Section 12 of this Employment Agreement by the Company against the Employee would not impose any undue burden upon the Employee. Employee also agrees that none of the restrictions in Section 12 of this Employment Agreement are unreasonable as to duration or scope. If any provision of this Employment Agreement is later held to be invalid, prohibited, or unenforceable in any jurisdiction for any reason, it will be more narrowly drawn so as not to be invalid, prohibited or unenforceable and the court making any such determination shall have the power to modify such scope, duration or area and that provision will be modified in such jurisdiction only. If any restriction is held to be invalid, prohibited or unenforceable in any jurisdiction for any reason, such provision, as to such jurisdiction, shall be ineffective only to the extent of such invalidity, prohibition or unenforceability, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

e. The Employee acknowledges and agrees that if Employee breaches or threatens to breach any of the promises contained in this Agreement, including, but not limited to the restrictions contained in Sections 12, 13, 14 and 15 of this Agreement, the Company shall, in addition to all other remedies the Company may have, be entitled to injunctive relief restraining such breach or threatened breach.

13. **Confidentiality.** The Employee acknowledges and agrees that employment with the Company will necessarily involve an understanding of and access to trade secrets and confidential or proprietary information and property pertaining to the business and affairs of the Company, any of its Affiliates and/or their respective licensors, clients, and prospects. Employee understands that he/she will enjoy a position of trust and confidence with the Company. In addition, the Employee acknowledges that s/he owes the highest duty to protect the assets of the Company, including all intellectual property, business methods, source code, development pipeline, or other information that could materially affect the Company's business. Accordingly, the Employee agrees that as a condition of employment, he/she is required to sign and comply with a Proprietary Information and Inventions Agreement (the "PIIA"), which requires, among other provisions, the assignment of patent rights to any invention made during his/her employment at the Company, and non-disclosure of Company proprietary information. Employee also agrees that:

a. all materials, computers, devices, records, documents, originals and copies (whether in print, electronic or other media) generated by the Employee or coming into his possession during the course of his employment relating to Services performed for the Company shall be the sole property of the Company or its Affiliate(s). Upon termination of employment or upon request of the Company at any time, the Employee shall promptly deliver all of the foregoing to the Company, or, if requested, promptly and permanently destroy all of same

b. each of the obligations of the Employee under Sections 12 and 13 of this Employment Agreement shall survive the termination of the Employee's employment by the Company for any reason whatsoever.

14. **No Conflicts**. The Employee represents that s/he is not party to any agreement, contract or understanding, whether of employment, consultancy or otherwise, in conflict with this Agreement or which would in any way affect, restrict or prohibit him/her from undertaking or performing services for the Company. The Employee hereby acknowledges that s/he has not foregone any other opportunity, financial or otherwise, in connection with commencing or rendering his services to the Company. Employee agrees throughout employment with Vestwell not to engage in any activity that could be considered a conflict of interest with the Company's business and comply with the Company's policies and procedures regarding outside business activities.

15. **Non-Disparagement.** At no time following the Start Date of this Agreement or any termination shall the Employee (i) make any statements, or take any other actions to disparage, defame, damage or compromise the goodwill, name, brand or reputation of the Company, its shareholders, or any of its affiliates (collectively, the "Company Goodwill") or (ii) commit any other action that could likely injure, hinder, or interfere with the operations of the Company, or any business relationships or good will of the Company, its shareholders, or its affiliates. A violation or threatened violation of this prohibition may be enjoined by the courts. The rights afforded the Company under this provision are in addition to any and all rights and remedies otherwise afforded by law. The Employee hereby represents and warrants that, prior to the Start Date, the Employee has not committed any of the foregoing actions described in this section.

16. **Notices**. All notices, requests, demands and other communications hereunder shall be in writing and delivered personally, by email or certified mail to the other party.

17. **Assignability and Binding Effect.** This Agreement shall benefit and be binding upon the heirs, executors, administrators, successors and legal representatives of the Employee and the Company and its successors and assigns. The obligations of the Employee may not be delegated or assigned. The Employee shall not be entitled to assign, transfer, pledge, encumber, hypothecate or otherwise dispose of this Employment Agreement or any of his/her rights under this Agreement. The parties agree that the Company and its Affiliates shall have the right to assign all or any part of its or their rights in respect of the covenants and agreements set forth in this Employment Agreement to one or more direct or indirect acquirers of any of the assets, business, or control of the Company or any of the Subsidiaries.

18. **Complete Understanding**. This Agreement, the Employee Proprietary Information and Inventions Agreement, Non-Disclosure Agreement, Company handbooks and compliance policies, and any incentive or benefit plan to which the Employee may be entitled to participate constitute the complete understanding and cancels and supersedes any and all

prior agreements and understandings between the parties with respect to the terms of the Employee's employment at the Company. No statement, representation, warranty or covenant has been made by either party except as expressly set forth in this Agreement. This Agreement shall not be altered, modified, amended or terminated except by written instrument signed by each of the parties.

19. **Governing Law**. This Agreement shall be governed by the laws of the State of New York, without regard to principles of conflict of laws. Any dispute under this Agreement shall be brought in state or federal court in New York County of New York. Employee agrees and acknowledges that this is a proper and convenient forum and will not raise objections to this venue based on inconvenient forum, improper venue or similar grounds.

**20. Section 409A**

a. Although the Company does not guarantee the tax treatment of any payments under this Agreement, the intent of the Parties is that the payments and benefits under this Agreement be exempt from, or comply with, Section 409A of the Internal Revenue Code of 1986, as amended, and all Treasury Regulations and guidance promulgated thereunder ("*Code Section 409A*") and to the maximum extent permitted the Agreement shall be limited, construed and interpreted in accordance with such intent. In no event whatsoever shall the Company or its affiliates or their respective officers, directors, employees or agents be liable for any additional tax, interest or penalties that may be imposed on Employee by Code Section 409A or damages for failing to comply with Code Section 409A.

b. Notwithstanding any other provision of this Agreement to the contrary, to the extent that any reimbursement of expenses constitutes "*deferred compensation*" under Code Section 409A, such reimbursement shall be provided no later than December 31 of the year following the year in which the expense was incurred. The amount of expenses reimbursed in one year shall not affect the amount eligible for reimbursement in any subsequent year. The amount of any in-kind benefits provided in one year shall not affect the amount of in-kind benefits provided in any other year.

c. For purposes of Code Section 409A (including, without limitation, for purposes of Treasury Regulation Section 1.409A-2(b)(2)(iii)), the right to receive payments in the form of installment payments shall be treated as a right to receive a series of separate payments and, accordingly, each installment payment shall at all times be considered a separate and distinct payment. Whenever a payment under this Agreement may be paid within a specified period, the actual date of payment within the specified period shall be within the sole discretion of the Company.

d. Notwithstanding any other provision of this Agreement to the contrary, if at the time of Employee's separation from service (as defined in Code Section 409A), Employee is a "*Specified Employee*", then the Company will defer the payment or commencement of any nonqualified deferred compensation subject to Code Section 409A payable upon separation from service (without any reduction in such payments or benefits ultimately paid or provided to Employee) until the date that is six (6) months following separation from service or, if earlier, the earliest other date as is permitted under Code Section 409A (and any amounts that otherwise would have been paid during this deferral period will be paid in a lump sum on the day after the expiration of the six (6) month period or such shorter period, if applicable). Employee will be a "*Specified Employee*" for purposes of this Agreement if, on the date of Employee's separation from service, Employee is an individual who is, under the method of determination adopted by the Company designated as, or within the category of employees deemed to be, a "*Specified Employee*" within the meaning and in accordance with Treasury Regulation Section 1.409A-1(i). The Company shall determine in its sole discretion all matters relating to who is a "*Specified Employee*" and the application of and effects of the change in such determination.

e. Notwithstanding anything in this Agreement or elsewhere to the contrary, a termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits that constitute "non-qualified deferred compensation" within the meaning of Code Section 409A upon or following a termination of the Employee's employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service" and the date of such separation from service shall be the date of termination for purposes of any such payment or benefits.

21. **Third Party Beneficiaries**. The parties acknowledge and agree that each of the existing and future Subsidiaries and the Company's existing and future Affiliates are intended third party beneficiaries of this Agreement.

22. **Mutual Waiver of Jury Trial, Class or Collective Action.** Each party waives the right to trial by jury in any action or proceeding based upon, arising out of, or in any way relating to this Agreement, whether sounding in contract or tort or otherwise. All disputes shall be submitted to mediation to be held in New York, New York with each party participating in good faith in the mediation and paying each of their own costs and expenses. If the mediation does not result in a settlement of any dispute, then the parties agree to submit the dispute to binding arbitration, before the American Arbitration Association ("AAA"), with an arbitration to be held in New York, New York and decided in accordance with the AAA Commercial Arbitration Rules. To the extent permitted by law, Employee waives any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which the Company or any of its affiliates is a party.

23. **Counterparts; Delivery by Email or Facsimile**. This Agreement may be executed in any number of counterparts by email or facsimile with the same effect as if all parties had signed the same document. All counterparts shall be construed together and shall constitute one agreement. No party shall raise the use of a facsimile machine or electronic transmission to deliver a signature as a defense to the formation of a contract and each such party forever waives any such defense.

24. **Prior Agreements.** Upon the execution and delivery of this Employment Agreement, any prior employment agreement or representation between the Company and the Employee shall terminate and be of no further force and effect except as specifically referred to in this Agreement.

The parties have executed this Agreement on the effective date shown above.

By: Sarah Riefenstahl

DocuSigned by:

F85884832BE7438...

Date: 11/16/2021

By: Vestwell Holdings Inc.

Name: Dave Sheen

Title: Chief Financial Officer

**EXHIBIT A**

**WHAT WILL YOU BE DOING?**

As the VP, 529 & ABLE you are responsible for ensuring that our clients are continuously receiving and recognizing value from the retirement platform that we are building. You will work closely with clients to understand their business objectives and develop success plans that enable Vestwell to meet those objectives. As the primary driver of client intelligence, you will be responsible for distributing relevant client context across the company specifically to product development and leadership and managing expectations accordingly. This role requires ownership and accountability of the strategic enterprise client through elements of business development, relationship management, and program/project management.

**WHAT YOU'LL BE DOING**

- Manage select relationships to drive success towards meeting business goals for Vestwell State Savings clients
- Interface with executives and work closely with decision makers to understand their unique business profile and identify their goals with Vestwell
- Design and execute success plans to optimize relationships, adoption, and satisfaction with Vestwell State Savings
- Conduct regular business reviews to highlight major value-add initiatives and enable a deeper understanding of client goals
- Work across multiple organizations (Business, Product, and Engineering) to project manage the implementation of solutions, tracking to gates and dates
- Develop initiatives to further drive engagement and value-recognition
- Drive growth by sourcing new business opportunities
- Set, manage, and communicate client expectations, both internally and externally
- Create an experience for clients that transcends the standard client-vendor relationship
- Communicate with clients regularly through email, phone, online presentations, screen share and in-person meetings to understand their current needs and ongoing requirements
- Provide updates to VSS clients and ensure the proactive and timely resolutions of issues as they arise
- Develop a trusted advisor relationship with key accounts, client stakeholders, and executive sponsors
- Ensure the timely and successful delivery of our solutions according to clients' needs and objectives
- Develop and maintain subject matter expertise on our products and services and industry compliance requirements to provide timely, professional and knowledgeable customer support
- Communicate clearly the progress of monthly/quarterly initiatives to internal and external stakeholders
- Monitor and analyze client's usage of our products/services to identify gaps in compliance
- Responsible for working with internal teams to onboard and integrate new clients and developing existing client relationships
- Assisting Sales/Operations teams with RFP responses for large opportunities

**REQUIREMENTS**

- Able to understand and translate business goals into actionable and measurable initiatives
- Experience in building relationships and garnering trust with executive decision makers and influencers
- A deep understanding of the financial industry & financial service technologies
- Capable of working collaboratively across multiple organizations
- Comfortable with managing escalations and executing on success plans
- Self-starter who is extremely organized and detail oriented
- Strategic and outside of the box thinker